UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLENE NORWOOD,

    Plaintiff,

vs.

Case No: _____

CITRUS WORLD, INC., d/b/a Florida's
Natural Growers, and FLORIDA'S
NATURAL GROWERS, INC.

    Defendants.
_____/

## COMPLAINT

NOW COMES Plaintiff Charlene Norwood ("Plaintiff" or "Ms. Norwood"), by and through the undersigned counsel, and hereby brings this action against Defendants Citrus World, Inc. d/b/a Florida's Natural Growers ("CWI") and Florida's Natural Growers, Inc. ("FNG") (collectively, "Defendants"). Plaintiff alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff brings this action against Defendants for violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), Section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Florida Civil Rights Act, and the Florida Whistleblower Act.

2. Plaintiff is a woman who resides in Lake Wales, Florida. Plaintiff is a citizen of Florida.

3. Defendant CWI is a Florida corporation with its corporate headquarters in Lake Wales, Florida. It is owned by its members and grows and processes citrus products, which it markets under the name "Florida's Natural Growers."

4. Defendant Florida's Natural Growers, Inc. is a Florida corporation with its corporate headquarters in Lake Wales, Florida. CWI owns and operates Florida's Natural Growers, Inc. and it is a division of CWI.

5. Defendants are employers as defined by the statutes identified herein upon which Plaintiff's claims are based.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under Title VII and Section 1981.

7. This Court also has supplemental jurisdiction over Plaintiff's related claims arising under Florida law pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this district under in that the unlawful employment practice was committed in this district; the relevant employment records are maintained in this district; and the Plaintiff would have worked in this district but for the alleged unlawful employment practice.

9. Defendants has its principal office in this district, and there is no other district that has substantial connection to the claim.

10. On October 27, 2020, Plaintiff timely filed a charge of race discrimination and retaliation with the Florida Commission on Human Relations and the U.S. Equal Employment Opportunity Commission ("EEOC").

11. Ms. Norwood attempted mediation with CWI though the EEOC's conciliation services program, but the parties' efforts were unsuccessful.

12. On or about August 30, 2021, the EEOC issued Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of receipt of that notice.

13. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court.

## GENERAL ALLEGATIONS

A. *Employment Discrimination and Retaliation*

14. Ms. Norwood became an Accounting Clerk in the Accounts Payable division at CWI in February 2008 as a temporary employee.

15. CWI offered Ms. Norwood a permanent position in that role in early 2009.

16. Defendants divide its accounting functions into different divisions: Accounts Payable, Inventory Accounting, and Customer Financial Services.

17. In early January 2020, CWI posted a hiring notice for a position in its Treasury Services department, which is a separate department that reports to the Defendants' Chief Financial Officer.

18. CWI has a policy or practice of giving first preference to current employees for promotions and in hiring for new positions internally.

19. Accordingly, it initially posts hiring notices for most positions internally before posting the announcement on external job search platforms outside of the company.

20. In early January 2020, it only posted the hiring notice for this Treasury Services position internally and did not post the announcement externally prior to January 15, 2020.

21. The early January 2020 posting for the Treasury Services position read to this effect:

> *Academic Qualifications Required:Requires (sic) a 4 year degree in Finance or Accounting.*
>
> *Experience Required Requires (sic) 2 years in an accounting or finance position.*

22. Ms. Norwood applied for the position.

23. Ms. Norwood was qualified for the role based on the qualifications listed in the hiring notice.

24. Ms. Norwood holds an associate of science (A.S.) degree in accounting from Florida Technical College and a bachelor of science (B.S.) degree in finance from Devry University.

25. At the time she applied for the position, Ms. Norwood had more than eleven years of accounting experience.

26. If Ms. Norwood had received the position, it would have been considered a promotion from her current position as an Accounting Clerk.

27. Shortly after she submitted her application, Ms. Norwood told Julie Hudson, her direct supervisor, that she wanted to obtain a position that was more geared toward her bachelor's degree in finance.

28. The response from Mrs. Hudson, who is white, was: "I wonder how Marci [McIntyre, who was at that time a white female and a staff accountant in the Treasury Services Department] would feel about having someone work under her who will have a higher degree than hers."

29. Ms. Norwood is the only African-American female employee within the Accounts Payable department.

30. Ms. Norwood is also the only employee in the department with a college degree.

31. Mrs. Hudson had a similar response when another African American female employee had applied for a different Staff Accountant position two years before Ms. Norwood's application.

32. Ms. Norwood heard Mrs. Hudson speaking with Mrs. Hudson's assistant, Charmayne Harvard, who is white, about the African-American woman's application.

33. The two women questioned how the black woman could ever be qualified for the position and expressed their strong preference for the white male employee who had also applied for the position.

34. When CWI receives an application from an applicant who meets the qualifications in response to its internal job postings, its policy or practice is to keep the bidding for the position internal.

35. As a result of Ms. Norwood's application, the company kept the bidding within the Accounting department per its preferential hiring policy or practice.

36. CWI interviewed Ms. Norwood for the position on or around January 13, 2020.

37. Only two employees, including Ms. Norwood, applied for the position.

38. On January 29, 2020, more than two weeks later, Migdalia Mitchell, a human resources supervisor, notified Ms. Norwood that she had not been selected for the position.

39. Ms. Norwood was the only candidate who applied prior to January 29, 2020 that met the qualifications in the job description for the position.

40. Four days later – or on or around February 3, 2020 – CWI reposted the position and opened it to the entire company rather than the Accounting department. The February 2020 job posting for the same position read:

*Academic Qualifications Required:Requires (sic) a 4 year degree in Finance or Accounting.*

*Experience Required Requires (sic) 2 years in an accounting or finance position.* <u>*2 years working with 401(k) and/or payroll preferred*</u>. (emphasis added)

41. The February 2020 job posting was exactly the same except for the addition of this statement emphasized above.

42. Ms. Norwood applied for the position a second time on February 5, 2020.

43. CWI decided not to consider Ms. Norwood's second application for the position that same day.

44. The next day – on or around February 6, 2020 – Gina Nance, a human resources manager, wrote Ms. Norwood an email in which she stated: "I wanted to let you know that I notified Treasury Services about your job bid. Although <u>*you do meet the qualifications of the job as it's written*</u>, the department has decided to consider outside applicants." (emphasis added).

45. After Ms. Norwood read the changed job description, she visited the company's Intranet system to read about the company's 401(k) plan.

46. The company made very little information available about its 401(k) plan on its Intranet system.

47. There were no employees at CWI charged with administering any element of the company's 401(k) plan outside of the Accounting Department.

48. There was little to no chance that an employee outside of the Accounting departments would fit the educational requirements and have in-depth knowledge of the company's 401(k) plan.

49. Ms. Norwood discussed the revised February 2020 posting with Mr. Muhammad Adam, an accountant and management employee in the Accounting departments.

50. Ms. Norwood indicated that, even if CWI hired a candidate from outside of the company, the candidate would still require training on the company's 401(k) plan, which would be the case for an employee hired internally.

51. Mr. Adam agreed with Ms. Norwood's statement.

52. In March 2020, CWI hired a white individual to fill the position.

53. After Ms. Norwood was denied the position in January 2020 and was not interviewed at all in February 2020, Ms. Norwood requested multiple meetings with human resources staff and senior management about why CWI took more than two weeks to inform her that it would not offer her the position and why she had not been offered the position despite her qualifications according to the terms in the January 2020 job posting.

54. She also met with senior management in February 2020 about this issue.

55. During this time period, Ms. Norwood met with David Barker, an HR manager, on or around February 18, 2020, about an allegation involving Kesmond Wilson, a black employee at CWI.[1]

---

[1] Wilson did eventually filed a race discrimination suit against CWI in this district on November 17, 2020. *See Wilson v. Florida's Natural Growers, Inc.*, No. 8:20-cv-002703-TPB-AEP. The case remains pending.

56. Mr. Barker asked leading questions and made implied statements that were not true or mischaracterized Ms. Norwood's understanding of the facts.

57. Mr. Wilson was subsequently terminated around February 20, 2020.

58. In February and March 2020, Ms. Norwood also met with an attorney who represented Mr. Wilson and who was investigating the facts surrounding his termination.

59. CWI has more than seven hundred employees, including a significant percentage of African-American employees.

60. In January 2020, there were no African Americans within the senior leadership, either as executives or department heads, at CWI.

61. Upon information and belief, as of the date of the filing of this complaint, there are no African Americans in senior leadership positions at CWI.

62. The management in the Accounting and Treasury Services Departments refused to promote the only qualified applicant for the position posted in January 2020 despite its preferential internal hiring policy because the applicant was an African-American female.

63. In April 2020, Ms. Norwood began receiving constant criticism of her work.

64. Mrs. Hudson began to micromanage her time and started intensive monitoring of her workday.

65. Ms. Norwood requested a team meeting with Mrs. Hudson, Mr. Adam, and another supervisor, Kay Gray-Weeks, to discuss what she felt was growing racial bias against her that had emerged after she applied for the promotion in the Treasury Services

Department and she participated in an internal investigation regarding Mr. Wilson in which she made statements favorable to Mr. Wilson.

66. During the meeting, Mrs. Hudson told the group: "You would think that she would be more professional with all the degrees and credentials that she has" – a statement that exposed Mrs. Hudson's resentment regarding Ms. Norwood's educational achievements which surpassed hers and other white management employees within the Accounting departments.

67. The statement is also consistent with Mrs. Hudson's statements when Ms. Norwood informed Mrs. Hudson that she was seeking a promotion in January 2020.

68. Starting in or around April 2020, Mrs. Hudson also began monitoring times that Ms. Norwood clocked in and clocked out, a practice Mrs. Hudson had not engaged in before Mrs. Hudson applied for the Treasury Services position.

69. Mrs. Hudson began monitoring Ms. Norwood's office phone records and tracking incoming and outgoing calls, despite the fact that Ms. Norwood's job duties include calling external vendors for credit card payments.

70. Mrs. Hudson also accused Ms. Norwood of making excessive numbers of personal calls without any proof that she had done so.

71. Ms. Norwood requested a performance evaluation so that the company would provide a complete presentation of her job performance rather than relying on the word of one supervisor to develop perceptions of her work that could ultimately her ability to obtain a promotion or that could lead to discipline.

72. A job performance evaluation would provide clear expectations and specific benchmarks for growth. It would also hold CWI accountable to provide proof of any negative assessment of her performance.

73. Ms. Norwood did not receive a performance evaluation in response to this request.

74. This same kind of hostility, micromanagement, and arbitrary criticism of Ms. Norwood's performance and changes in her working conditions has continued unabated.

75. As late as July 2021, Ms. Norwood asked to change her schedule after she raised the fact that Mrs. Hudson's only other two direct reports – both of whom are white women - have been allowed to maintain flexible schedules.

76. In a meeting on July 13, 2021, Ms. Norwood asked Mr. Adam, Mrs. Hudson, and Mr. Barker if Defendants could change the start and end time of her workday by fifteen (15) minutes (from 8:00 to 8:15 a.m. and from 5:00 p.m. to 5:15 p.m.).

77. Mrs. Hudson responded that everyone had to be out of the office by 5:00 p.m. Mr. Adam added that it was for "security reasons" because of the presence of petty cash.

78. One of the white female employees, however, has been allowed to remain in the office after 5:00 p.m. with no limit as to how long she can be there.

79. Ms. Norwood has had a key to the office for more than twelve years. Defendants' refusal of her request to work after 5:00 p.m. while allowing a white employee permission to do the same thing implied that Ms. Norwood might steal because she was black. Consequently, Ms. Norwood surrendered her key back to the Defendants.

B. *Whistleblower Retaliation*

80. Mrs. Hudson is the manager of the Accounts Payable department in which Ms. Norwood works as an accounting clerk.

81. In or around May 2020, Clentis Turman, III of Turman's Landscaping and More, LLC ("Turman's Landscaping") submitted a bid to serve as a contractor for FNG.

82. Multiple landscaping companies, including Turman's Landscaping, had submitted bids to provide landscaping services for FNG.

83. Upon information and belief, Mrs. Hudson's daughter, Megan Pearce, was at the time a significant other or fiancée of Clentis Turman, III, the owner of Turman's Landscaping.

84. Defendants' Accounts Payable department handles payments of invoices from the Defendants' vendors on the companies' behalf.

85. As a result, Accounts Payable has access to all of the amounts which FNG's landscaping services providers charge FNG for their services.

86. Mrs. Hudson was aware of the amounts that FNG paid for landscaping services to its providers before Turman's Landscaping submitted its bid.

87. Mrs. Hudson told either her daughter, Pearce, or Turman the lowest bid or the current rate that FNG paid to its landscaping services provider prior to FNG selecting Turman Landscaping's bid.

88. This information allowed Turman to submit a bid below that amount in order to have FNG select its bid and enter into a contract with Turman's Landscaping.

89. Ms. Norwood informed management that she was aware that Mrs. Hudson had leaked bid information in order to give her daughter's fiancé an advantage in the bidding process.

90. After disclosing this information, management told Ms. Norwood that she could no longer advance at the company.

## COUNT I
## Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964

91. Plaintiff restates the allegations in paragraphs 1 through 79 as if fully set forth herein.

92. Plaintiff is African American. Therefore, she belongs to a protected class under the statute.

93. Plaintiff was qualified for and applied for a position that Defendants were seeking to fill.

94. Despite Plaintiff's qualifications, Defendants rejected her application.

95. Defendants filled the position with an individual outside the protected class.

96. A company HR manager admitted that she "[met] the qualifications for the job as it's written" in February 2020.

97. CWI has claimed that the Treasury Services position had the "primary function" of administering the company's 401(k) plan. Yet the January 2020 posting did not list 401(k) experience as a qualification for the position. Likewise, the February 2020 posting only listed 401(k) experience as "preferred."

98. From January 2020 to February 2020, the job did not change. Defendants' alleged needs for the employee in the job also did not change. The need to train a qualified

employee, whether Defendants hired internally in accordance with company policy or hired externally, did not change.

99. The only element that changed was a new line in the job description. Defendants changed the posting to "write Ms. Norwood out" of the position.

100. The company intentionally added the qualification because it knew it was the only qualification that Ms. Norwood, who had spent her entire career in accounting as an employee of Defendants, arguably did not have.

101. CWI's position that the February 2020 posting "clarified . . . the job description" is a pretext for racial discrimination and its deliberate decision to refuse Ms. Norwood the opportunity for a promotion because of her race.

102. Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs and attorney's fees of bringing this action.

103. Defendants intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, are liable jointly and severally for punitive damages.

## COUNT II
### Violation of 42 U.S.C. § 1981

104. Plaintiff restates the allegations in paragraphs 1 through 79 and 92 through 101 as if fully set forth herein.

105. Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs and attorney's fees of bringing this action.

106. Defendants intentionally violated Plaintiff's rights under Section 1981, with malice or reckless indifference, and, as a result, are liable jointly and severally for punitive damages.

## COUNT III
## Retaliation in Violation of Title VII of the Civil Rights Act of 1964

107. Plaintiff restates the allegations in paragraphs 1 through 79 as if fully set forth herein.

108. In February 2020, Plaintiff engaged in protected activity by participating in an internal investigation into allegations involving Kesmond Wilson, another black employee, who claimed he was a victim of employment discrimination.

109. In or around February and March 2020, Plaintiff also met with the attorney for Wilson, who was in the process of pursuing his discrimination claims against FNG, and provided information related to the case.

110. From February through May 2020, Plaintiff met with senior management demanding information surrounding the denial of her application for a promotion in January 2020 and its refusal to interview her for the position in February 2020 because she was concerned that the decision stemmed from racial discrimination.

111. In May 2020, a CWI management employee informed Ms. Norwood that she could no longer advance at the company.

112. Ms. Norwood's direct supervisor also began to micromanage her work and make false allegations against her about how she spent her time at work – steps which the supervisor had not taken prior to Ms. Norwood engaging in protected activity.

113. CWI has refused to give Ms. Norwood a performance evaluation to support any negative assertions about her performance.

114. Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs and attorney's fees of bringing this action.

115. Defendants intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, are liable jointly and severally for punitive damages.

## **COUNT IV**
## **Violation of the Florida Civil Rights Act**

116. Plaintiff restates the allegations in paragraphs 1 through 79 and 92 through 101 as if fully set forth herein.

117. Defendants have engaged in race discrimination in violation of Fla. Stat. § 760.01 to 760.11.

118. As a direct and proximate result of Defendants' violation of the Florida Civil Rights Act, Plaintiff has suffered lost wages and benefits, severe emotional distress, suffering, inconvenience, mental anguish and non-pecuniary losses.

119. Plaintiff respectfully requests a jury trial on all issues and relief as follows:

    a. Compensation for all compensatory damages allowed by law;

    b. Compensation for punitive damages allowed by law;

    c. Payment for the loss of future wages;

    d. An award of reasonable attorney's fees and costs;

    e. Interest; and

    f. Such other additional equitable and legal relief as may be just and proper.

## COUNT V
## Violation of the Florida Whistleblower Act

120. Plaintiff restates the allegations in paragraphs 1 through 9, 14 through 17, and 80 through 90 as if fully set forth herein.

121. This is a whistleblower action for declaratory relief and damages.

122. Plaintiff is an employee as defined by Fla. Stat. § 448.101(2).

123. Plaintiff is further protected under section 448.102 because:

124. Plaintiff objected to and refused to participate in conduct which constituted bid rigging and bid leaking in violation of the Florida Antitrust Act and the federal Sherman Act. *See* 15 U.S.C. § 1 ("Every contract, combination . . . or conspiracy in restraint of trade or commerce . . . is . . . illegal."); Fla. Stat. § 542.18 ("Every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful.").

125. As a management employee of Defendants, Mrs. Hudson conspired with Turman's Landscaping to deprive Turman's competitors of the opportunity to win a competitive bid. Thus, an agreement between Mrs. Hudson and Turman's Landscaping restraining trade existed under these facts.

126. Defendants may be held liable for such actions which Mrs. Hudson undertook under the cloak of the corporation's apparent authority. Thus, Defendants had a vested interest in covering up Mrs. Hudson's actions.

127. Defendants' actions in informing that she would no longer have the opportunity to advance in the company after she reported Mrs. Hudson's bid rigging and bid leaking violated her rights under Fla. Stat. § 448.102(3).

128. Plaintiff asks the Court to enter its judgment against the center for compensatory damages pursuant to Fla. Stat. § 448.101 et seq.; to grant her such other relief as may be proper, including back wages and benefits, seniority and prospective relief, front pay; and to order the center to pay Plaintiff's reasonable costs and attorney's fees pursuant to Fla. Stat. § 448.104.

## DEMAND FOR JURY TRAIL

Plaintiffs demand a jury trial for all issues so triable.

**Dated:** November 29, 2021

*Respectfully submitted,*

*/s/ Jade A. Craig*
**JADE A. CRAIG**
Florida Bar No. 121805
Primary email: jadecraig@gmail.com
Secondary email: jade@jadeacraigpa.com
JADE A. CRAIG, P.A.
2910 Rubideaux St., #1
Tampa, Florida 33629
Telephone: 813.459.1309
Facsimile: (813) 251-4373

*REMAINING SPACE INTENTIONALLY LEFT BLANK*